MELINDA J. CARR and ALISTAIR P. CARR,

Plaintiffs,

v.

NEW GLARUS SCHOOL DISTRICT,

Defendant.

OPINION AND ORDER

17-cv-413-wmc

*Pro se* plaintiffs Melinda J. Carr and Alistair P. Carr are appealing from the results of a three-day due process hearing under the Individual with Disabilities Education Act ("IDEA"). On behalf of their son, "S.C.," the Carrs are specifically challenging an April 12, 2017, decision by Administrative Law Judge Sally Pederson, denying their claims that the New Glarus School District ("District") failed to provide S.C. with a free, appropriate public education ("FAPE") during the 2015-2016 school year, as guaranteed by the IDEA, by: (1) not offering a math class appropriate to meet S.C.'s needs nor paying the cost of a needs-appropriate math class at the University of Wisconsin-Madison; and (2) not implementing various provisions of his individualized education program ("IEP"). (ALJ Dec. (dkt. #22-1) at 2, 13-14, 16-17.) Both the District and the Carrs are seeking summary judgment. (Dkts. ##67, 71). For the reasons that follow, the court will grant the District's motion, deny the Carr's motion and direct entry of final judgment.

## I.      S.C.'s Educational Background

In 2012, an IEP team in the District identified S.C. as a child with a traumatic brain injury ("TBI"), whose resulting disability made him eligible to receive special education and related services.  Before his December 2010 injury, S.C. had been identified as a gifted and talented student.  S.C.'s IEP included the results of a 2013 assessment of his post-injury abilities, called the "Adolescent Test of Problem Solving" or "TOPS2."  (AR (dkt. #13), Ex. 21 at 56.) [2]  That evaluation placed S.C. in the 16th percentile for "Making Inferences," and the 25th percentile for "Transfer Insights."  Following the 2013 assessment, a Speech and Language Therapist ("SLT") unsurprisingly identified "Making Inferences" as an area of weakness for S.C.

The Carrs were residents of the Belleville School District during the relevant time period.  For the 2015-2016 school year, however, they applied to enroll S.C. in the Oregon and New Glarus School Districts.  S.C. began that school year in the Oregon School District, and that district developed an IEP for him.  After the first week of school, however, the Carrs requested that S.C. be allowed to transfer to the New Glarus School District.  After the District accepted, S.C. began attending the New Glarus High School as a junior

---

[1] The following facts are drawn from the parties' proposed findings of fact and responses, as well as underlying testimony and exhibits submitted during the due process hearing.  Unless otherwise noted, the following facts are undisputed.

[2]  Record cites are to the administrative record of the due process hearing.

in September 2015.  At the time, the district also accepted the August 2015 IEP created by the Oregon School District.

The August 2015 IEP provided that S.C. would participate full-time with non-disabled peers in regular education classes, but that he would also receive special education services for 15 minutes once a week from special education staff.  The special education services were described in the IEP as "academic self-management" which focused on teaching S.C. "study skills and following up with organization and prioritization."  The IEP further provided for multiple services and aids:

(a) Double time on math assessment(s);

(b) Use of personal cell phone for organizational purposes;

(c) Pair written directions and information with verbal cues to support awareness and memory.  Repetition of cues if [S.C.] does not respond;

(d) Checks and reminders for understanding of instructions, task requirements, due dates, study strategies, and assistance breaking down long-term assignments/projects into components with due dates - to be provided by regulation education staff 10 minutes three times per week;

(e) For situations where [S.C] missed a component of the requirements due to faulty executive functioning, extended timeline for assignment completion or redoing assignment(s); and

(f) Must follow class policy to qualify for retake of summative assessments, may retake assessments for replacement grade.

The IEP also contained two annual goals.  The first goal was for S.C. to "break down assignments and organize his work so that he is able to turn in 100% of summative and formative assignments on time."  The IEP indicated that S.C.'s progress in attaining this goal would be measured by discussions between S.C. and his teachers.  This first goal set forth five, short term objectives:  (1) S.C. will use an organizational system of his choice

and share it with his case manager at least one time a week; (2) S.C. will independently use a study skill strategy and communicate with his case manager by email to study for all tests at least three days before the summative assessments; (3) S.C. will independently review summative assignment requirements/rubrics in an email to his case manager at least three days before they are due; (4) S.C. will independently complete a check list of tasks to be completed for each assignment and check them off as they are completed daily; and (5) S.C. will independently set reminders on his personal cell phone for nightly activities to be completed on a daily basis. However, as for each of these objectives, the IEP did *not* require any teacher or staff member to: verify the accuracy of S.C.'s self-reporting of missing and completed assignments; check his grades and missing assignment on the school intranet; consult with other teachers to determine if S.C.'s grades were lower than expected due to incomplete rubrics; or consult with other teachers about working with S.C. on study strategies.

The IEP's second annual goal was that S.C. "will research at least three career opportunities of his interest by the end of the IEP." This second goal similarly set interim objectives for S.C. to reach: (1) explore at least three careers and evaluate how they meet both his interests and his skill sets; (2) explore the entry requirements and career educational path for the careers he identified; and (3) identify at least three, post-secondary schools with programs in his area of interest and identify admission requirements.

On September 11, 2015, S.C.'s special education teacher/case manager, Shannon Castrodale, provided S.C.'s regular education teachers with his "IEP At-a-Glance," informing them of the basic accommodations and modifications in S.C.'s IEP that they were responsible for implementing. (AR (*see* dkt. #3), Ex. 12, at NGSD-0143-44.) S.C.'s

IEP At-a-Glance is a two-page document that lists his name, grade, disability, his case manager/special education teacher (Castrodale), and a chart that set forth S.C.'s seven accommodation/modifications for his regular teachers to implement, as well as the frequency and location for those accommodations.  The accommodations listed were:

- extended time for math tests and quizzes (up to 2 times the allotted time), for all assignments;

- use of cell phone for organizational purposes; pair written directions and information with verbal cues to support awareness and memory - repeat verbal cues if S.C. does not respond;

- checks and reminders for understanding instructions, task requirements, due dates, study strategies;

- assistance breaking down long term assignments and projects into components with due dates, for multi-step and large assignments and projects;

- extended timeline for assignment completion or redoing an assignment, when S.C. missed a component of the requirements due to faulty executive functioning; and

- may retake assessments for a replacement grade, provided that he follows the class policy for the retake.

The "IEP At-a-Glance" document also included four bullet points of "other important information":  S.C. is highly motivated to do well; S.C. has difficulty with long-term memory due to his injury, so it is important to touch based with him prior to assessments with study tips; S.C. uses a planner on a daily basis and will take a snapshot and share it with teachers for the teacher to check for accuracy; and Melinda Carr requested to be contacted if his grades fall below 90% or S.C. is not turning in his homework.

At the due process hearing, the Carrs disputed a number of issues related to the IEP-At-a-Glance.  For example, the Carrs claimed that:  (1) S.C.'s IEP was *not* made available to his teachers; and (2) the IEP At-a-Glance failed to properly inform his teachers of a

number of requirements set forth in the IEP. The Carrs further disputed whether Castrodale fulfilled S.C.'s IEP goals and objectives, pointing out that Castrodale did not notice every instance in which S.C. missed an assignment.[3]

According to the District's special education teacher, Shannon Castrodale, she met with S.C. fifteen minutes per week to work on academic self-management. These meetings included: checking S.C.'s planner to make sure he had recorded his assignments; reviewing and discussing S.C.'s study plans for upcoming tests, assignments and projects; working with him on strategies and study skills to help him turn in assignments on time; and discussing and checking his grades. Castrodale also conducted a weekly check of S.C.'s grades on Canvas, the District's electronic grade book system. In doing this check, Castrodale could see if S.C. had missing assignments. Moreover, when S.C. did have missing assignments, Castrodale claims she contacted the regular education teachers to check on the status of the assignments. S.C. did not turn in all of his assignments on time, and Castrodale was not satisfied that fifteen minutes was a sufficient amount of time for her to consistently accomplish all of these tasks with S.C.

While the Carrs insist that Castrodale did not actually conduct these weekly meetings until November 11, 2015, which was the point when Castrodale started saving her Case Manager Notes, they cite no specific evidence suggesting that the earlier meetings never took place. Melinda Carr also insists that Castrodale did not *actually* check S.C.'s

---

[3] Because the Oregon School District did not fax S.C.'s full IEP until September 17, 2015, the Carrs suggest that the defendant District let S.C. start without an IEP in place. However, the record establishes that S.C.'s special education teacher already had *and* circulated the IEP-At-a-Glance within the defendant District on September 11, 2015. Accordingly, the Carrs cannot reasonably dispute that the District did not have the IEP until September 17.

grades, relying on an October 15, 2015, email from Castrodale reporting that S.C.'s grades were mostly A's and B's, while a D grade in pre-calculus was "news to her." (AR, Ex. 27.) In that email, however, Castrodale also reported that she had been checking in with S.C. two times a week about his grades.

The parties do not dispute that S.C.'s chosen organizations system was a paper planner and that Castrodale reviewed the planner with S.C. on a weekly basis. According to Castrodale, she also asked S.C. to send her emails about his study strategies at least three days before a test and to program reminders of activities and assignments into his cell phone. In contrast, the Carrs maintain that Castrodale did not tell S.C. to email her until December of 2015. Castrodale also testified that when S.C. did not email her, she asked him to write reminders to himself, continued to discuss those issues, and provided him with prompts during their weekly meetings. While Castrodale created progress reports for S.C. for each trimester, these progress reports did not accurately report all of S.C.'s missing assignments.[4]

With respect to the IEP's second goal related to S.C.'s career, Castrodale worked with him on one specific career. Since S.C. already had an interest in sound engineering, they discussed the colleges S.C. was interested in, and Castrodale provided S.C. with printouts of the entrance requirements for those colleges.

---

[4] Castrodale testified that she asked S.C. to add tasks to his checklist of items to complete, but she did not force him to do them independently.

## II.    The District's Math Curriculum

In the first trimester of the 2015-2016 school year, S.C. was enrolled in a pre-calculus math class that used the College Preparatory Math (CPM) methodology.  It so happens that the District adopted this methodology as part of a new math curriculum for the 2015-2016 school year.  CPM requires students to use deductive and inductive reasoning to work on math problems with their peers, and then receive feedback, assistance or redirection from the math teacher and their peers.  This new method differs from the traditional method which focuses on direct teacher instruction.  However, CPM had been adopted by other school districts in Dane County as well.

S.C.'s pre-calculus class was comprised of five students.  On September 23, 2015, Melinda Carr sent S.C.'s math teacher, Lauren Walker, an email asking about the CPM approach, as well as informing Walker that due to S.C.'s TBI, he has problems with organization and deductive reasoning, but responds well to inductive reasoning, meaning that he can grasp information told directly to him.  (AR, Ex. 15 at NGSD-0165.)  Walker responded by explaining the CPM philosophy and emphasizing that the best way for students to learn is to work in groups at problem-solving.

At the hearing, the Carrs submitted considerable evidence pertaining to the appropriateness of CPM for S.C.'s unique needs.  To their understanding, the CPM method applies the same principles evaluated in a "critical thinking" assessment, like the sub-test for "Making Inferences" that was a part of S.C.'s TOPS2 assessment.  During the hearing, Walker acknowledged the difficulty S.C. had drawing inferences using deductive reasoning, which could make the CPM approach difficult.  However, Walker further testified that as a part of her daily lessons, she would check in with the class to determine

8

whether her students were tracking and learning on a daily basis, and that her one-on-one meetings with S.C. addressed the problems he was having. (AR, Tr. at 360-61.) Unlike his parents, Walker did not conclude that S.C. could not learn pre-calculus using CPM.

## III.  S.C.'s Performance Issues and the Parties' Attempts to Revise the IEP

During an October 2015 parent-teacher conference, Melinda learned that S.C.'s pre-calculus grade at that point was a D.  Melinda discussed her concern with Walker, as well as some apparent gaps in S.C.'s algebra skills from his prior school year.  Afterwards, Walker began meeting with S.C. a few times a week to assist S.C. with homework and provide direct instruction as needed.  Walker also began serving as S.C.'s coach for Khan Academy, a free on-line program that provides direct math instruction.

Trigonometry was part of S.C.'s pre-calculus class, and S.C. failed a trigonometry test on November 24, 2015, and he also failed the retake.  Accordingly, in December of 2015, Melinda asked Walker to add trigonometry to S.C.'s Khan assignments.  On January 5, 2016, Walker responded to Melinda's request, telling her that she would add trigonometry, but that the Khan Academy database for trigonometry was not very extensive.  Ultimately, despite the D-average in October and failed test in November, S.C. ended the first trimester with a C+ grade in pre-calculus.  His other grades included A's in introduction to engineering, band and history, and a B+ in literature.

Based on his C+ grade, the Carrs were concerned that S.C. might not be eligible for calculus for his senior year.  In an email to the Carrs, however, Walker assured the Carrs that pre-calculus grades were not the only measure used in considering a student for calculus.  In fact, Walker relayed that she had worked with other students to make a plan

and set improvement goals to eventually make them eligible for calculus. Still, as a result of the Carrs' concerns, the District convened an IEP team meeting on December 2, 2015, to discuss S.C.'s math instruction. Melinda, S.C., Walker, Castrodale, and the District's special education director attended this meeting. The group discussed potential changes to S.C.'s IEP goals to provide more services related to his study skills and organization, as well as providing him more math instruction services. Unfortunately, this team meeting did not go well: Melinda did not agree to any of the proposed changes to S.C.'s IEP, and after approximately 45 minutes, Castrodale became upset and left.

On December 7, 2015, Melinda requested another IEP team meeting, indicating that she wanted to revise S.C.'s IEP to change it to a "consultation" IEP. She also requested that in the meantime S.C.'s math teacher continue monitoring his Khan academy assignments and to stop Castrodale's meetings with S.C. until after the next meeting. The team meeting to address those requests was scheduled for after the holidays.

On December 18, 2015, however, Melinda met separately with the New Glarus High School principal and the special education director to discuss whether S.C. could take a math class in another district. According to both the principal and special education director, they told Melinda that there was no need to set up a distance-learning math program because the high school already had a pre-calculus teacher who could meet S.C.'s math needs. Melinda not only disputes the principal and teacher's version of the meeting on December 18, she testified that neither one gave her an answer about S.C. taking a math class outside of the District curriculum.[5] From that time until January 2016, when

---

[5] During this informal meeting, Melinda further insists that she discussed S.C.'s Speech and Language Therapy ("SLT") results in his IEP Evaluation report, which she viewed to indicate that S.C. would not benefit from the CPM instruction method. However, Melinda cites no evidence

S.C. left the math class, Walker continued to provide additional support services and accommodations for S.C.

Before the January 7, 2016, IEP team meeting, Castrodale provided the Carrs a draft IEP. Present at the meeting were Melinda, the parent advocate, the high school principal, the special education director, Castrodale, Walker, the school psychologist (Jane O'Brien), and the special education director from the Belleville School District. There was not an SLT specialist at the meeting, and none of the meeting participants had consulted such a specialist beforehand. The focus of this follow-up meeting was S.C.'s math instruction. While Melinda requested a new math goal be added to the IEP, school psychologist O'Brien opined that S.C. did not need a math accommodation because his assessments did not show a math learning disability. The Carrs also requested that the IEP be changed to a "consultation" IEP, effectively meaning that the only special education service would be a meeting with Castrodale once per trimester. However, the District recommended just the opposite: an increase in S.C.'s special education services to 60 minutes per week to give Castrodale more time to work on academic coaching, so that S.C. could become more independent in his study skills in preparation for college.

Again, the IEP team failed to reach a consensus. Instead, after ending the meeting, Melinda requested a "facilitated meeting," while the special education director informed the Carrs that the District intended to implement a revised IEP in 15 days that increased S.C.'s special education services. During that meeting, Melinda did not suggest that they were considering enrolling S.C. in a math class at the UW-Madison, nor did she request

---

that she actually testified about this before the ALJ, nor does she cite to any other evidence suggesting that they discussed S.C.'s SLT results.

that the District place S.C. in such a class or request the District to pay for it.  Before the Carrs left that day, the special education director asked each of the other team members their opinions about the District's proposed revisions to the IEP.  Additionally, according to the Carrs, the special education director later wrote in an email to the Carrs that they could do whatever they wanted, but that the District would not provide the modification the Carrs were seeking.  (*See* AR, Ex. 38.)

On January 13, 2016, Melinda met with the New Glarus High School principal to ask about enrolling S.C. in a UW-Madison math class for spring semester, instead of continuing pre-calculus in the District.  Although the principal did not believe that S.C. had exhausted all available high school courses in the subject area first, he signed a form agreeing that S.C. had met all the pre-requisites for the course.  (AR, Ex. 41.)  At that time, Melinda did not request that the District pay for the cost of that class.[6]  At no point did the Carrs provide the District with prior written notice that they were enrolling S.C. at UW-Madison.

On January 15, 2016, the special education director provided the Carrs with the revised IEP, which had been discussed at the January 7 IEP meeting.  The revised IEP contained one annual goal ("[S.C.] will stay current with his class work and prepare for assessments by meeting"), and set seven objectives related to planning, organization skills and study strategies.  It further provided that S.C. would receive special education services in the form of academic coaching in the special education resource room, twice per week,

---

[6]  The District maintains that Melinda actually indicated that they (the Carrs) would pay for it. The Carrs dispute this fact, claiming that Melinda affirmatively asked the District to pay for it at this time.  However, the evidence she cites in support is her testimony that she did not ask the principal until later, on *March 1, 2016*, if the District could pay for the math course.

20 minutes each time. The revised IEP also described several supplemental aids and services to be provided to S.C. by regular education teachers, including double time on all math assessments.

Unfortunately, the revised IEP was never successfully launched. Instead on January 22, 2016, the special education director learned that plaintiffs filed a request for a facilitated IEP with the Wisconsin Special Education Mediation System, prompting the director to inform the Carrs that the District would wait to implement the revised IEP and continue implementing the September 2015 IEP. The District agreed to a facilitated IEP, but after the first facilitator withdrew, the Carrs cancelled the rescheduled meeting. At that point, the Carrs requested a mediation and the District declined. At some point in March of 2016, the District then implemented the revised IEP for approximately one week, but stopped once the Carrs filed a complaint with the Department of Public Instruction ("DPI"). The District then reverted back to the September 2015 IEP. Ultimately, S.C. received a grade of B- in the traditionally taught math class at UW-Madison. By the January 2017 due process hearing, S.C. had transferred back to the Belleville School District.

In their DPI complaint, the Carrs requested an order requiring the District to pay: (1) $5,537 to cover the cost of the UW-Madison math class; and (2) $20,250 to cover the cost of 14 months of executive functioning coaching for S.C. following the District's alleged failure to provide executive functioning coaching to S.C. for the 2015-2016 school year, as contemplated by the September 2015 IEP.

## IV.    S.C.'s June 2016 Evaluations

After the 2015-2016 school year, but before the due process hearing, the Carrs requested a Comprehensive Psycho-Educational Assessment for S.C., and he was evaluated by a private school psychologist, Nira Scherz-Busch.  As a part of this evaluation, S.C. took several tests, including the "Wechsler Adult Intelligence Scale - 4th edition."  S.C.'s verbal IQ result was 141, placing him in the 99th percentile.  In Scherz-Busch's opinion, S.C. was also in the "superior range" for math calculation and fluency, but he struggled with math reasoning, and his "preferred mode" of processing was determined to be deductive, rather than sequential reasoning, meaning that "he does better being taught the big picture and then fitting the details into the big picture."  (AR, Tr. 283, lns. 12-19.)  While Scherz-Busch recommended several accommodations in her subsequent report, she made no specific recommendations about the type of math teaching that S.C. required or otherwise opined about the appropriateness of the CPM method.  (AR, Ex. 29 at 5-7.)


## V.    The ALJ's Conclusions[7]

On October 31, 2016, the DPI received the Carrs' request for a due process hearing, and the matter was referred to ALJ Sally Pederson as Case No. DPI-16-0027.  ALJ Pederson conducted the due process hearing over three days, January 12, February 22, and February 23, 2017. During the hearing, both Carrs were in attendance, as well as representatives

---

[7]  The Carrs dispute the majority of the District's proposed findings of fact purporting to recount ALJ Pederson's conclusions.  Certainly the Carrs are entitled to argue the merits of the ALJ's conclusions, which the court addresses below in resolving their claims, but those arguments do not create a genuine issue of fact related to the ALJ's conclusions as set forth in defendants' proposed finding of fact.

from the District. The ALJ heard testimony from the Carrs, their witnesses, as well as witnesses from the District, and received 57 exhibits. On April 12, 2017, the ALJ reached the following conclusions: (1) from January to May 2016, the District provided S.C. with FAPE, despite not offering a math class requested by the Carrs and by not paying the cost of S.C. taking a needs-appropriate math class at the University of Wisconsin-Madison; and (2) during the 2015-2016 school year, the District provided S.C. with FAPE because it adequately implemented his IEP. (ALJ. Dec. (dkt. #22-1) at 2, 13-14, 16-17.)

A.     **Reimbursement for UW-Madison Math Course**

More specifically, the ALJ determined that the District had no obligation to reimburse plaintiffs for the cost of S.C.'s UW-Madison math class on two grounds. *First*, the ALJ began with the threshold inquiry in any reimbursement question under the IDEA: whether the District had already offered S.C. a FAPE that met his individual needs. The Carrs had argued that the District denied S.C. a FAPE by refusing to revise his IEP in January 2016 to include a pre-calculus course taught using a traditional methodology through verbal presentation of the material. However, the ALJ rejected that argument, concluding that S.C. *was* offered FAPE because: (1) the September IEP did not include math special education services; (2) his math teacher started working with him in October, when his pre-calculus grad fell to a D, and S.C. ended up with an improved grade (C+) at the end of the trimester; (3) S.C.'s math teacher felt that he made meaningful progress; (4) S.C.'s parents refused to add a math goal during the January 2016 IEP meeting, instead preferring that S.C. be taught math using a traditional methodology; (5) the District had discretion to determine whether to use the CPM or traditional methodology to teaching

math; and (6) pre-calculus was challenging for S.C., as well as most regular education students in that advanced class.

With respect to the Carrs' January 2016 request, the ALJ found that *the Carrs* had rejected the District's proposal to provide S.C. special education services, and the District had discretion to determine what instructional methodology it would use. In any event, the ALJ found CPM was not inappropriate for S.C., finding in particular that S.C.'s performance in math improved in October of 2015 when his teacher started working with him more closely.[8]

*Second*, the ALJ pointed out a reimbursement may be denied under the IDEA if the parents (1) failed to inform the IEP team that they were rejecting the school district's proposed placement and (2) failed to state their intent to enroll their child in a private school at the most recent IEP meeting or ten days before removal. The ALJ further noted that reimbursement can be rejected upon a finding that the parents acted unreasonably under 20 U.S.C. § 1412(a)(10)(C)(iii)(1). While the ALJ found the Carrs had made it apparent at the January 2016 IEP meeting that they did not agree with the revised IEP (and that their decision to end the meeting was sufficient to notify the District that they were rejecting the District's proposal), the ALJ further found the Carrs failed to inform the

---

[8] The ALJ acknowledged in a footnote that the Carrs had raised an additional argument in their post-hearing briefing, claiming the District violated the IDEA by not including an SLT specialist on S.C.'s IEP team who could interpret the instructional implications of his IEP Evaluation results. In the Carrs' view, school psychologist Jane O'Brien was not qualified to do this. However, the ALJ was unpersuaded by this argument. Moreover, as the ALJ also pointed out, the Carrs had not raised this issue in their due process hearing request as required by Wis. Stat. § 115.80(4) (providing that "the party requesting the hearing may not raise issues at the hearing that were not raised in the notice ... unless the other party agrees").

District that they were considering enrolling S.C. in UW-Madison and, instead, unilaterally enrolled him in that class.[9]

## B.  Implementation of IEP Provisions

Next, the ALJ concluded plaintiffs failed to meet their burden to show that the District failed to provide S.C. with several provisions of the IEP.  Since plaintiffs challenge each of ALJ Pederson's six conclusions, the court addresses them in greater detail below. To summarize, however, ALJ Pederson rejected the Carrs' arguments that:  (1) the IEP At-a-Glance was an improper way to inform S.C.'s regular education teachers about his needs; and (2) Castrodale failed to carry out various obligations under the IEP related to S.C.'s organization, planning, assignment completion, and transition goals.

## OPINION

Plaintiffs Melinda and Alistair Carr are exercising their right to challenge the ALJ's decision made after an IDEA due process hearing in federal court under 20 U.S.C. § 1415(i)(2).  In reviewing that decision, the court must:  (i) receive the records of the administrative proceedings; (ii) … hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, … grant such relief as the court determines is appropriate." § 1415(i)(2)(C).  Accordingly, this court's obligation is to "make an independent decision based on the preponderance of the evidence," while

---

[9] The ALJ specifically found that the principal's signature on the enrollment form did not constitute notice under the IDEA and Wisconsin special education statutes.  In any event, the ALJ found that S.C.'s parents had acted unreasonably in enrolling him unilaterally at UW-Madison.

giving "due weight to the determinations made during the state administrative process." *Board of Educ. of Tp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 270 (7th Cir. 2007) (citing *Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)); *see also Board of Educ. v. Murphysboro v. Illinois Board of Education*, 41 F.3d 1162 (7th Cir. 1994) (the district court is obligated to "independently determine whether the requirements of the Act have been satisfied").

At the same time, the Seventh Circuit cautions that in reaching its independent decision, a district court should not "substitute [its] own notions of sound educational policy for those of the school authorities." *Heather S. v. State of Wis.*, 125 F.3d 1045, 1052-53 (7th Cir. 1997); *Patricia P. v. Board of Educ. of Oak Park,* 203 F.3d 462, 466 (7th Cir. 2000) ("courts do not have special expertise in the area of educational policy, they must give 'due weight' to the results of the administrative decisions"). In resolving the parties' cross motions for summary judgment, therefore, this court's standard of review "differs from that governing the typical review of summary judgment." *Heather S. v. State of Wis.*, 125 F.3d 1045, 1052 (7th Cir. 1997). Specifically, judgment may still be appropriate "when facts are in dispute, … based upon a preponderance of the evidence." *Beth B. v. Van Clay*, 282 F.3d 493, 496 n.2 (7th Cir. 2002). Furthermore, in choosing "not to take new evidence and relies solely on the administrative record, this court owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.' This level of review is akin to the standards of clear error or substantial evidence." *Alex R. v. Forrestville Valley Cmty. Unit Sch.*

*Dist. No. 221*, 375 F.3d 603, 611-12 (7th Cir. 2004).[10]

# I.    S.C.'s Pre-Calculus Math Class

Plaintiffs first challenge the ALJ's finding that the District's refusal to revise S.C.'s IEP to include a pre-calculus math course, taught verbally using a traditional methodology, did not deny his right to a FAPE. The IDEA requires school districts, as recipients of federal education funds, to provide children with disabilities FAPE in the least restrictive environment. 20 U.S.C. § 1412. Under this requirement, the FAPE should be "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186*, 41 F.3d at 1166. However, this statutory directive does not require the District "to educate a handicapped child to her highest potential"; instead, the education provided must be "sufficient to confer some educational benefit upon the handicapped child." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 200, 102 S. Ct.

---

[10] This standard applies to the court's review of the ALJ's decision here even though the Carrs were allowed to supplement the administrative record to correct a technical error. Earlier in this case, the Carrs sought to supplement the administrative record significantly, first by essentially reopening discovery to allow them to find experts on two different topics, and second by adding two pages to complete an exhibit. The court denied plaintiffs' request for new experts because they did not identify their proposed experts, and they failed to explain how those experts filled in a necessary gap before the ALJ or otherwise would have impacted the results of their claims at the due process hearing. (Order (dkt. #58) at 10-12.) However, the court granted their last request, permitting the Carrs to substitute one of the exhibits admitted during the due process hearing because it was apparent that an incomplete version of that exhibit was inadvertently admitted. Specifically, the exhibit -- an internet printout describing the TOPS2 evaluation -- excluded the second and third pages. (*Id.* at 12-13.) Still, plaintiffs only relied on the first page of that exhibit -- the same page that the ALJ had access to during the hearing. As such, those pages had *zero* impact on this court's review, and the ALJ's decision is subject to the deferential standard articulated by the Seventh Circuit in *Alex R.*, 375 F.3d at 611-12.

3034 (1982). More specifically, the IDEA provides that every covered child must have an IEP, which is created and periodically reviewed following meetings that include parents, teachers, school personnel and educational experts. A child's IEP includes her statement of special education, related services and accommodations the school will provide for the child. 20 U.S.C. § 1414(d)(1)(A). Once school officials and parents agree on a child's IEP, the district must put it into effect. § 1414 (d)(2)(A).

Recently, the United States Supreme Court clarified that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1 580,* U.S. --, 137 S. Ct. 988, 999 (2017). In evaluating a student's progress, "[o]bjective factors, such as regular advancement from grade to grade, and achievement of passing grades, usually show satisfactory progress." *Alex R. ex rel. Beth R.*, 375 F.3d at 615. In this case, the District met its substantive obligations.

As an initial matter, in criticizing the adopted IEP for math, plaintiffs ignore that the District is allowed discretion in determining what S.C.'s IEP should entail, and certainly how, if at all, it should be revised mid-stream. Instead, plaintiffs argue that the ALJ should have concluded independently that: (1) S.C. could not learn using the deductive reasoning of CPM; and (2) S.C.'s pre-calculus class within the District denied him FAPE. In support, plaintiffs contend that S.C.'s 16th percentile "Making Inferences" result on the 2013 TOPS2 evaluation establishes that he was not equipped to learn pre-calculus using the CPM method. They further contend that the CPM methodology relies *wholly* on a student's ability to make inferences, pointing to S.C.'s math teacher Lauren Walker's description of CPM, which "sounds like" the description of "Making Inferences"

in the TOPS2 evaluation. However, plaintiffs cite no other record evidence in support of either contention. In fact, ALJ Pederson received evidence that the TOPS2 evaluation is *not* intended to evaluate a student's math skills, and other record evidence contradicts the suggestion that S.C.'s math education required a solid command of deductive reasoning. Nor does the evidence show that CPM is based solely on deductive reasoning, particularly for S.C. who received additional one-on-one teaching from Ms. Walker. To begin, the formal description of the TOPS2 "Making Inferences" evaluation is as follows:

> The student is asked to give a logical explanation about a situation, combining what he knows or can see with previous experience/background information. Students who do well on this subtest make plausible inferences, predictions, or interpretations.

(AR, Ex. 48.) Next Walker described how she teaches CPM:

> [CPM] is based on the idea that students do better when they have to do the work and have it, then, checked by peers and teachers. And it's this cyclic process of getting to try out the material, see what they think about it, justify what they come up with. … Come to conclusions, and then check that against what a teacher might say or something else that they might -- another example they're presented with. … Sometimes it's very, I guess what you'd call traditional, where it just says, here are some formulas we're going to use. Let's start using them.

(AR, Tr. 329-30.) While Walker acknowledged using deductive reasoning in teaching pre-calculus using CPM, she also described using both deductive and inductive reasoning and making efforts to respond to individual students' needs.

> I would say that it really balances. If I had to pick one over the other, I would say that a lot of the lessons start with deductive, try some cases, access your prior knowledge, access something that we did yesterday, and then let's move along with that to find something new. But not always, not at all. That's not always the case.

(AR, Tr. 353.) Even accepting that a student's ability to make inferences may benefit them when taught using CPM methodology, the ALJ was justified in finding that S.C.'s actual

experiences in Ms. Walker's pre-calculus class were reasonably calculated to let him progress.

In fact, ALJ Pederson was justified in finding that S.C. actually *did* progress. While plaintiffs challenge this finding by citing to S.C.'s other, notably higher, evaluation scores to argue that S.C.'s pre-calculus grades were simply not indicative of his intellectual capabilities, the ALJ ultimately concluded that S.C.'s performance still showed improvement during the trimester. In doing so, the ALJ recognized that pre-calculus is a notoriously challenging class for a regular education student, and also that S.C. started with a D grade in October of 2015. At that point, however, the ALJ found significant that Walker stepped in, provided extra assistance by meeting S.C. outside of the classroom when possible, and worked with him on Khan Academy assignments. The ALJ was further justified in finding that S.C. made progress because he ended up with a C+ grade for the first trimester, a clear indicator that his learning had improved after Walker started working with him. ALJ Pederson also weighed Melinda's testimony that S.C. is a "gifted student with no deficits in math" (AR, Tr. 780-81) against Walker's testimony that she believed S.C. to be making meaningful progress in a challenging class (AR, Tr. 341, 350-51), ultimately finding Walker's testimony more persuasive.

To be fair, the record shows that S.C. failed a pre-calculus test in November of 2015, as well as a re-take of that test, and the ALJ did not specifically address that result in her conclusions. However, the record also contains an email from Walker to S.C. and plaintiffs dated November 30, 2015, *after* S.C. had failed the test that confirms both Walker's efforts to help S.C. improve and his overall improvement. (AR., Ex. 15, at NGSD-230-31.) More particularly, Walker's email reported that S.C. scored an 81% on his second "End Course"

test, which was an improvement over his last test. Walker further observed that even though the more recent test covered different material than the earlier test, there were "a lot of improvements on some of the concepts" and that S.C. had "used some strategies" to answer the multiple-choice questions. (*Id.*) Given S.C.'s documented improvement, the ALJ's failure to account for one failed test in particular does not amount to clear error.

Plaintiffs also argue that the C+ grade did not demonstrate progress because they believed that S.C. could not qualify to take calculus his senior year with that grade, but that simply was not the case. To the contrary, Walker's November 30 email also explained that she "never take[s] the grade as the only measure when considering a student for Calculus," adding that she commonly worked with students in S.C.'s shoes to help them qualify to take calculus despite lower grades. (*Id.*) Even accepting that an improved but still low grade could demonstrate a "lack of progress" if it prevents the student from taking the next higher class, Walker's demonstrated willingness to help S.C. take calculus as a senior was more than sufficient for the ALJ to conclude that S.C.'s experience in math class was "reasonably calculated" to allow him to progress.

Similarly, plaintiffs would fault the ALJ for not specifically mentioning S.C.'s B-grade at UW-Madison, as well as his improved ACT score. Yet again, neither of these metrics suggest that ALJ Pederson committed clear error. While plaintiffs seem to believe that S.C.'s B- grade at UW-Madison proves that the CPM method denied him a FAPE, S.C.'s additional progress could have simply been the product of his ongoing improvement with difficult subject matter or at least the ALJ was permitted to find without specifically mentioning this apparent marginal improvement.

Finally, plaintiffs argue that the ALJ improperly ignored Scherz-Busch's testimony

during the hearing that S.C. had "superior abilities in math calculation and fluency but struggled with step by step reasoning, as used in the CPM method." Again, however, the court is unable to find that this constitutes plain error. As an initial matter, Scherz-Busch did not include any specific recommendations about the appropriateness of the CPM method. Indeed, plaintiffs mischaracterize Scherz-Busch's testimony by citing only a snippet of it, when, in fact, her testimony was less conclusive with respect to the appropriateness of CPM. She actually testified that S.C. "does less well, although not horrible, with step by step sequential information or processing" (AR, Tr. at 283), which is a far cry from opining that S.C. was not receiving an opportunity to progress by being taught using the CPM methodology. While the Carrs may be admired for their fierce advocacy on behalf of their son, the overall record here actually reflects a school district that seemed to be making every effort to implement the IEP, as well as to consider reasonable amendments to it. The record simply does not support a finding that the District failed to provide him with a FAPE. In particular, while S.C.'s pre-calculus grades in the first trimester certainly differed from his other grades and evaluations, the ALJ grounded the finding that S.C. was not denied FAPE on undisputed and persuasive evidence that the District had given S.C. the opportunity to progress, and that in fact, he did so.

## II.     Claim for Reimbursement of S.C.'s Private Tuition Payments

Plaintiffs separately challenge the ALJ's conclusion that the Carrs were not entitled to reimbursement for the cost of the UW-Madison math course S.C. ultimately took in the spring of 2016. As an initial matter, for the plaintiffs to prevail in this challenge the ALJ

would have had to find that: (1) the District did not make FAPE available to S.C.; *and* (2) the course was proper under the IDEA. 20 U.S.C. § 1412(a)(10)(C). Moreover, reimbursement may be reduced or denied if:

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa).

§ 1412(a)(10)(C)(iii)(I). Even assuming that S.C.'s math education did not provide him a FAPE, ALJ Pederson correctly concluded that plaintiffs did not meet these statutory prerequisites for reimbursement.

Plaintiffs essentially reargue their previous position before the ALJ: they did not decide to enroll him at UW until after January 7, 2016, when they first learned that the District would not adjust his IEP to include a traditional math course; that apparently left them with just six days before the start of classes at UW-Madison to get him enrolled; and thus, they did not have the opportunity to request reimbursement ten business days before enrolling him. Moreover, plaintiffs point out, they did not receive the school principal's authorization until January 13, 2016. According to plaintiffs, this tied their hands and precluded their giving the requisite ten-day notice.

While plaintiffs may have believed they had no choice but to enroll S.C. at UW-Madison, they do not explain why they did not request reimbursement as soon as they decided to enroll him. Nor do plaintiffs explain why, during their conversations with the

principal and special education director, they failed to indicate that they would be seeking reimbursement for the class (if not actually suggesting that they would pay for it themselves). *See,* discussion, supra, n. 6. Regardless, the record supports the ALJ's findings, alternatively, that: (1) S.C. was not denied a FAPE; and (2) plaintiffs failed to make timely requests for reimbursement. Moreover, on this record, the court finds further that plaintiffs acted unreasonably in pursuing reimbursement for the UW-Madison course well after the fact, another statutory basis for denying reimbursement. *See* § 1412(a)(10)(C)(iii)(III) (reimbursement may be reduced or denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents").

### III.   S.C.'s 2016-2017 IEP

Finally, plaintiffs challenge the ALJ's conclusion that the District adequately implemented S.C.'s IEP during the 2016-2017 school year. Plaintiffs purport to challenge all six findings upon which the ALJ's conclusion was based, but have not demonstrated that any of those findings amounted to clear error. To the contrary, the administrative record shows that the District acted in accordance with the directives of the IEP, and further that the District's IEP team members wanted to give S.C. *more* services for the 2016-2017 school year, but *plaintiffs* repeatedly (intentionally or not) stood in the way of their being able to do so. If anything, the true gist of plaintiffs' complaint is that S.C. did not *actually* improve during the 2016-2017 schoolyear, but the District was not required to actually make improvements, only to put S.C. in a reasonable position to do so in accordance with the IEP's goals and objectives.

#### A. Claimed Failure of the Special Education Teacher to Inform all of S.C.'s Teachers about the IEP

As they did at the hearing, plaintiffs take issue with the substance of the "IEP At-a-Glance" document prepared by special education teacher Shannon Castrodale for S.C.'s regular education teachers. Plaintiffs claim that Castrodale did not actually circulate this document, and in any event, that the information in that document did not sufficiently alert S.C.'s regular education teachers about his particular accommodation needs. In support, they cite to Melinda's hearing testimony that she learned during a parent teacher conference that "none of his teachers knew" that S.C. even had an IEP. (AR, Tr. 798.) There are at best two problems with that argument. First, Melinda also testified that S.C.'s math teacher, Walker, *did* know about his IEP by the second week of school. This considerably weakens her assertion, especially given their concern with S.C.'s performance centered almost exclusively on his math class. Second, and more importantly, the ALJ received and considered Melinda's testimony, but ultimately rejected it as unfounded hearsay based on other, contradictory evidence. Specifically, the ALJ found that the "credible evidence on the record" showed that Castrodale *did* provide S.C.'s regular education teachers with the IEP At-a-Glance, referring to Castrodale's own testimony and Exhibit 12, an email correspondence between Castrodale and all of S.C.'s teachers. (*See* Decision (dkt. #22-1) at 4.) Finally, the ALJ properly rejected the notion that S.C.'s teachers as a group did not have sufficient information about S.C. Indeed, the IEP did not even require his regular education teachers to have copies of the IEP.

### B. Claimed Failure of the Special Education Teacher to Work with S.C. on Organizational, Prioritization and Study Skills

In challenging this conclusion, plaintiffs next challenge the implementations of the 2016-2017 IEP based on evidence at the hearing showing that S.C. did not organize his

papers in his binders by class, which in their view shows that Castrodale failed to work with him on organization skills. They further argue that S.C.'s use of a planner did not accomplish the IEP objective regarding organization. Yet plaintiffs submit no record evidence that rebuts Castrodale's direct testimony that she met with him weekly to discuss how he was recording his assignments and preparing for upcoming tests, as well as regularly checking and discussing his grades. While plaintiffs take issue with the fact that much of Castrodale's testimony is not reflected in the documentary evidence, they have cited no contradictory evidence either. Likewise, while plaintiffs take issue with the *efficacy* of Castrodale's efforts, they submit no evidence suggesting that Castrodale did not actually meet with him on a weekly basis to help S.C. improve his organizational and preparation skills. Regardless, this court will defer to the ALJ's credibility determinations.

### C. Claimed failure by the Special Education Teacher to Monitor S.C.'s Email and Put Appointment and Assignment Reminders in his Phone

Plaintiffs also reargue that Castrodale should have *required* S.C. to email her about assignments, pointing out that S.C. did not actually send the emails and that Castrodale did not use their weekly meetings to have S.C. input reminders in his phone. As the ALJ concluded, however, the IEP required S.C. to take on these tasks *independently*. Plaintiffs ignore this conclusion, instead focusing on when Castrodale started telling S.C. to email her, which they assert occurred after February of 2016, when Melinda explicitly asked Castrodale to start directing S.C. to send her that reminder email. (AR., Ex. 46.)[11] While

---

[11] Plaintiffs similarly complain about Castrodale's record-keeping, arguing that her progress reports contained errors and that her weekly checklists did not begin until November of 2015. They claim that even though the ALJ had Exhibit 9 (Castrodale's progress notes) and Exhibit 10 (the weekly checklists Castrodale filled out related to S.C.'s progress), she failed to account for the differences or how they allegedly showed Castrodale's failings. While the ALJ did not specifically address

this exhibit shows that Melinda emailed Castrodale at that time, relaying S.C.'s report that Castrodale had *never* actually asked him to send her emails three days before tests and quizzes, that same email also shows Castrodale informed Melinda that she had been discussing upcoming and tests and quizzes during their weekly meetings. Given that Castrodale's meetings were working toward improving S.C.'s organizational habits, and that plaintiffs concede that Castrodale did send those reminder emails for at least a portion of the school year, plaintiffs have not shown that the ALJ's rejection of this argument constituted clear error.

Plaintiffs also attempt to read more into the IEP's requirements arguing that *Castrodale* should have reached out to S.C.'s teachers for his test and quiz dates, so that Castrodale could email S.C. as a prompt. This argument broadens the *actual* objective of the IEP, which was that *S.C.* would "independently" use a study skill strategy and email Castrodale three days before to a test or quiz to inform her of his study strategy. The ALJ recognized that this objective did not *require* Castrodale to take such additional steps, and instead that she fulfilled her obligations under this objective by repeatedly prompting him to email. Certainly, Castrodale could have proactively done more than the IEP called for, especially when it became apparent that S.C. was failing to hold up his part of the bargain,

---

Exhibits 9 and 10, she certainly considered them. As for Exhibit 9, the ALJ recognized that Castrodale's progress reports "may have had some minor errors regarding the number of missing assignments," but ultimately concluded that there was no evidence that they were "so inaccurate" that they denied S.C. FAPE. Similarly, while Exhibit 10 includes only checklists from November of 2015 forward, Castrodale testified that she had been keeping records of her weekly meetings with S.C., but she only started saving them in November of 2015 (AR, Tr. at 194). The ALJ found her testimony credible, and this court has no basis to hold otherwise. Accordingly, the ALJ plainly did not "ignore" the implications of Exhibits 9 and 10.

but the court does not disagree that meeting with and encouraging S.C. to do so was sufficient to meet the District's FAPE obligation.

Setting aside any dispute the parties have about what Castrodale did or should have done, the ALJ did not end her analysis there, but also considered S.C.'s actual performance, ultimately concluding his performance suggested improvement: S.C.'s lowest grade during the school year was a C+, and Castrodale and the District's special education director both opined that S.C. made progress during the year. While plaintiffs now insist that if Castrodale had made more efforts to ensure S.C. wrote down reminders and completed his assignments, his grades could have been even better, the question before the ALJ was not whether the District ensured that S.C. reached his highest potential, but whether S.C.'s educational experience gave him a reasonable opportunity to progress.

### D. Other Claimed Failures by the District to Verify the Accuracy of S.C.'s Self-reporting and to Consult with Teachers

Plaintiffs similarly argue that the District should have taken additional steps to make sure that S.C. completed missing assignments, but they do not point to any specific requirement within the IEP that supports their position. Instead, they believe that the verification requirements would be integral to ensure that S.C. was meeting his IEP goal of turning in assignments on time and completed. Again, however, nothing in the text of the IEP imposes those additional responsibilities. And in fact, the evidence before the ALJ showed that Castrodale actually wanted to adjust the IEP to spend *more* time with S.C. to work on his organizational skills and address the problem of his incomplete or missed assignments, but that *plaintiffs* rejected that offer. As such, the ALJ's rejection of this argument had more than adequate footing in this record.

### E. Claimed Failure by the Special Education Teacher to Track S.C.'s Missed, Late or Partial Assignments

In challenging this conclusion, plaintiffs point out that Castrodale's weekly checklists (*see* AR, Ex. 10) showed that he turned in 20 late assignments during the trimester, but Castrodale's progress report did not reflect the frequency of those late assignments. While the ALJ noted that Castrodale's progress reports did contain some errors regarding missing assignments, she found no evidence showing that they were so inaccurate that they resulted in a denial of FAPE, and actually the evidence showed that Castrodale worked with S.C. to help him progress toward his goal and wanted to spend even more time with S.C. to devote to improving his organizational skills, which included tracking missed assignments. Moreover, beyond arguing again that S.C.'s grades could have been better had Castrodale recorded more missing assignments, plaintiffs do not submit any evidence – such as a missed educational opportunity -- suggesting that these mistakes precluded him the reasonable opportunity to progress. As such, and in giving due deference to the ALJ's determination that Castrodale's errors did not actually deny S.C. the chance to progress, the court sees no clear error.

### F. Claimed Failure to *Require* S.C. to Make Progress

Finally, plaintiffs claim that the ALJ did not properly consider the evidence related to Castrodale's work with S.C. on the transitional role. They point out that S.C. was supposed to work on *three* different potential careers, but that Castrodale only worked with him on one. Yet plaintiffs' argument again relies on a faulty premise: that the IEP *required* S.C. to make progress towards his transition goal. Moreover, plaintiffs ignore the work that Castrodale and S.C. did together: they discussed his interest in a career in sound

31

engineering and the colleges S.C. was interested in, and she provided S.C. with printouts of the entrance requirements for those colleges. While Castrodale's specific discussions with S.C. about potential occupations were more limited than the IEP's goal that S.C. learn about three different careers, that simply means S.C. did not accomplish the annual goal, not that he made no progress. Once again, the ALJ did not commit clear error.

ORDER

IT IS ORDERED that:

(1) Defendant New Glarus School District's motion for summary judgment (dkt. #67) is GRANTED.

(2) Plaintiff's motion for summary judgment (dkt. #71) is DENIED.

(3) The clerk of court is DIRECTED to enter judgment in defendant's favor and close this case.

Entered this 12th day of October, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge